998 A.2d 868

**Gary Samuel AGURS**

v.

**STATE of Maryland.**

**No. 11, Sept. Term, 2009.**

Court of Appeals of Maryland.

May 19, 2010.

Reconsideration Denied Aug. 20, 2010.

Kenneth W. Ravenell (Milin Chun, The Murphy Firm, Baltimore), on brief, for petitioner.

Douglas D. Guidorizzi, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, BARBERA and ADKINS, JJ.

GREENE, J.

Our task in the present case is to review the Court of Special Appeals' determination that the Circuit Court for Baltimore County erred in suppressing the evidence obtained as a result of a search of the petitioner, Gary Agurs' home.[1]

---

1. When we refer to the petitioner's "home" in this opinion, we are also referring to the vehicles, belonging to the petitioner, that were searched. The warrant was issued for a search of the petitioner's home, and, according to the Statement of Probable Cause describing the execution of the search, the vehicles were parked in the garage, driveway, and in front of the petitioner's home. In its opinion below, the Court of Special Appeals assumed that the warrant applied to the vehicles because they "were parked within the house's curtilage at the time police executed the search warrant." The petitioner contends, however, that, despite the Statement of Probable Cause, "[t]here is

The trial court and the Court of Special Appeals both determined that there was no substantial basis upon which the issuing judge could have found probable cause to issue the warrant authorizing this search. Accordingly, the trial court excluded the evidence, but the Court of Special Appeals, relying on *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and our decisions applying *Leon*, concluded that exclusion was inappropriate because the police officers relied on the warrant in good faith.

We shall hold that the "good faith" exception to the exclusionary rule, as established by the Supreme Court in *Leon* and applied by this Court in *Patterson v. State*, 401 Md. 76, 930 A.2d 348 (2007), and other cases, does not prohibit exclusion of the evidence in this case. The affidavit submitted to the issuing judge provided no indicia of probable cause to believe that contraband would be found in the petitioner's home. The affidavit also provided limited facts suggesting that the petitioner was involved with criminal activity that might justify the search. Accordingly, no reasonably well-trained police officer could have believed that there was probable cause to search the petitioner's home. We shall therefore hold that the trial court was correct to suppress the evidence recovered during the search.

## PROCEDURAL HISTORY

This case originated in the Circuit Court for Baltimore County. On April 11, 2007, the petitioner, Gary Samuel Agurs, was arrested and charged with a variety of offenses relating to possession and distribution of Controlled Dangerous Substances ("CDS") and possession of firearms. He was subsequently indicted.[2] Before trial, he filed a motion asking

absolutely no evidence or assertion in the record placing the cars within the curtilage of the house during the search" and that this issue "has never been litigated." We need not resolve this factual dispute because we conclude that the exclusionary rule applies to all evidence recovered pursuant to the warrant.

2. Specifically, Gary Samuel Agurs was indicted for two counts of possession of, with intent to distribute, a Controlled Dangerous Sub-

the trial court to exclude all evidence recovered from a search of his home and vehicles, arguing that there had been no probable cause to support the warrant authorizing the search and that the good faith exception to the exclusionary rule did not apply.  On April 17, 2008, the trial judge conducted a hearing and granted Agurs' motion, concluding that there had been no probable cause upon which to base the warrant because there was no "nexus between any illegal activity, the home, or his vehicles."

The State noted a timely appeal to the Court of Special Appeals.  That court issued an unpublished opinion in which it reversed the trial court's ruling.  Although the intermediate appellate court concluded that "the issuing judge had a substantial basis to find probable cause that Agurs was somehow involved with [his alleged associate Andrew] Tillman in the distribution of cocaine," it also concluded that no warrant should have been issued to search Agurs' house or vehicles because "the issuing judge did not have a substantial basis to conclude there was a fair probability police would find evidence of drug law violations" in those places.  Nonetheless, the intermediate appellate court held that exclusion was inappropriate because it concluded that "none of the four established limitations to the [good faith exception to the exclusionary rule] apply to the warrant."

Agurs petitioned this Court for certiorari, presenting the following question:

Whether the Court of Special Appeals misconstrued *Patterson v. State*, 401 Md. 76 [930 A.2d 348] (2007), and erred in finding good faith where the search warrant was based on

---

stance ("CDS"), Md.Code (2002), § 5–602 of the Criminal Law Article; possession of a firearm under sufficient circumstances to constitute a nexus to a drug trafficking crime, § 5–621(b)(1) of the Criminal Law Article; possession of cocaine, § 5–601 of the Criminal Law Article; possession of marijuana, § 5–601(c)(2) of the Criminal Law Article; two counts of illegal possession of a regulated firearm, Md.Code (2003), § 5–133(c) of the Public Safety Article; and possession of a firearm by a person convicted of a felony involving a CDS, § 5–622(b) of the Criminal Law Article.

an affidavit that was so lacking in probable cause as to render official belief in its existence entirely unreasonable?[3]

We granted certiorari on that question, *Agurs v. State*, 407 Md. 275, 964 A.2d 675 (2009), and shall answer it in the affirmative.

## FACTS

On April 6, 2007, two detectives from the Baltimore City Narcotics Unit applied for and obtained "a search and seizure warrant pertaining to violations of the Controlled Dangerous Substance laws, Criminal CR 5–101 through CR 5–1101[4] of the Criminal Law Article of Maryland." The affidavit submitted in support of the application for the warrant lists two residences, five vehicles, and four individuals to be searched. The affidavit identifies one of the residences, 3 Six Point Ct., Windsor Mill, MD 21244, as Agurs' residence, based on the detectives' review of Maryland Motor Vehicle Administration ("MVA") records. The affidavit asserts that the other residence, 904 Mount Holly St., Baltimore, MD 21229, was frequented by Agurs' alleged associate, Andrew Lee Tillman. Four of the vehicles listed in the affidavit are identified as belonging to Agurs, with the other belonging to Tillman.[5] The four individuals to be searched were Agurs; Maria Bertina Agurs, Agurs' wife; Tillman; and Talesha Shappell Conquest, who is identified as living in and owning the second residence and owning a vehicle Tillman was seen driving.

3. The State presented a conditional cross-petition for review of the Court of Special Appeals' conclusion that there was no substantial basis for the warrant authorizing the search of Agurs' home. We did not grant certiorari on that question.

4. Sections 5–101 to 5–1101 of the Criminal Law Article constitute Title 5 of that article, titled "Controlled Dangerous Substances, Prescriptions, and Other Substances."

5. The four vehicles identified in the affidavit as belonging to Agurs were a 2001 Ford Explorer, a 2006 Mercedes, a 2007 Lexus, and a 2007 Ford F–150. The other vehicle, a 1999 Mercury Grand Marquis, was identified as belonging to Tillman.

After setting forth the places and people to be searched, the affidavit describes the detectives applying for the warrant. One detective is described as having been a member of the Baltimore City Police Department since March 1998 and as having had training in illegal narcotics enforcement, automobile theft, wiretaps, and current drug trends. It also describes him as having worked in a variety of departments and as having testified as an expert witness in the area of illegal narcotics. Finally, the affidavit asserts that the detective is familiar with CDS and drug paraphernalia, has participated in hundreds of arrests involving narcotics, and has executed approximately 400 search and seizure warrants for illegal narcotics. The affidavit describes the other detective as having been a member of the Baltimore City Police Department since 2002 and as having been involved with over 500 drug arrests and over 30 search and seizure warrants. It also describes his specialized training related to CDS; familiarity with the language, terminology, street slang, prices, and packaging related to CDS; and involvement with surveillance of thousands of narcotics transactions. Finally, the affidavit asserts that the detective has interviewed narcotics distributors and users, has testified as an expert witness concerning CDS, and has been part of the Baltimore City Organized Crime Division Narcotics Investigation Section and Violent Crime Impact Team.

The affidavit then sets forth information about drug traffickers that the detectives "know[ ]" because of their "training, experience and participation in other investigations involving illegal CDS." The detectives asserted their belief that drug traffickers often use assumed names, keep large amounts of cash on hand, maintain records relating to their trafficking, keep contraband and other related items in secure locations (such as their residences), use domestic banks and other financial devices to store their profits, maintain records of their associates, take and keep photographs of themselves and their possessions, use vehicles to move drugs and currency, and rent the vehicles they use for such activities.

Next, the affidavit asserts a variety of alleged facts that were "either known to [the detectives] through personal observation or [had] been obtained through reliable confidential sources, law enforcement reports and/or directly from other law enforcement officers." As these asserted facts are central to this case, we shall summarize them extensively:

- The police had been investigating drug trafficking in the Edmondson Village and Cherry Hill areas of Baltimore City, and "multiple confidential informants" advised the detectives that "Agurs and associates were upper level distributors supplying crack cocaine in and around these locations."

- A confidential informant, referred to as "CI–2440," had previously led the police to several drug arrests and seizures. Another confidential informant, referred to as "CI–3232," had led the police to recover "approximately 2 ounces of suspected crack cocaine."

- CI–2440 informed the police that "a male known as 'G' was supplying suspected crack cocaine in and around the area of Edmondson Village." He informed the police that he did not personally know "G," but that "G" was a Baltimore City employee who "was assisted by his 'cousin' ... 'Dru.'" Based on a photo of Agurs, CI–2440 positively identified Agurs as "G." Agurs was an employee in the Baltimore City Department of Public Works in the Sanitation Division.

- In March 2007, under police observation and direction, CI–3232 made two controlled purchases of suspected crack cocaine from Tillman, who was driving a burgundy 1999 Mercury Grand Marquis with tinted windows and Maryland tag number A128989. CI–3232 advised the police that Tillman was known as "Dru."

- On or about March 27, 2007, the police followed Tillman as he drove around Cherry Hill in the same Grand Marquis for approximately two hours. They saw Tillman park in several areas, where people approached his car and entered the passenger side for about one minute each. The

people each left "actively and cautiously looking around prior to quickly leaving the area." Police followed Tillman into Edmondson Village, where Tillman parked and entered the rear door of 904 Mount Holly St.

- On or about March 30, 2007, the police saw Agurs leave 3 Six Point Ct. and enter a burgundy 2007 Ford F–150 with Maryland tag number 17T388, which he drove for approximately ten minutes while talking on a cell phone. Agurs parked and stood outside of the 2800 block of W. Lafayette Ave., where a black Infinity pulled up and an unknown black male left the car and approached Agurs. They entered a clothing store for approximately one minute, after which "the unknown male slowly exited the store cautiously looking around in each direction" with "a bulge in his right pocket, which was not previously noticeable." Both men left the area in their vehicles.

- Agurs then drove his truck to an auto detail shop, where he stood for approximately an hour while talking on his cell phone and with passers-by. Tillman then pulled up to the detail shop in the Grand Marquis and Agurs got in the passenger side of the car. Agurs left Tillman's car two minutes later and Tillman "quickly left the area," after which Agurs drove away.

- Police saw Tillman entering or leaving 904 Mount Holly St. several times, most recently around March 27, 2007, and they saw his Grand Marquis there early in the morning and late at night. Constellation Energy records listed Conquest as the account-holder for 904 Mount Holly St., and the police searched several databases to determine that Conquest owned the home and listed it as her residence.

- The Grand Marquis had never been seen at its registered address, 311 Mountain Ridge Ct., Apt. I, Glen Burnie MD, 21061, which Tillman listed as his address with the MVA. The Constellation Energy account at that address was inactive. On or about November 8, 2006, Tillman provided the 311 Mountain Ridge Ct. address to the police

during a traffic stop. He was operating a 1993 Honda Accord registered and owned by Conquest.

- The police saw Agurs enter and leave 3 Six Point Ct. several times, most recently around March 30, 2007. His vehicles—a 2001 Ford Explorer, a 2006 Mercedes, a 2007 Lexus, and the Ford F–150—were seen there multiple times during the early morning and evening. Constellation Energy records listed Agurs as the account holder for 3 Six Point Ct., and the police searched several databases to determine that Agurs and his wife owned the home and listed it as their residence.

- Agurs' criminal record shows that he was convicted of CDS manufacturing and production in 1991 and of CDS possession twice in 1987. It also shows that he has been convicted of prostitution twice (2002 and 2000), robbery (1991), and "unauthorized use" (1987), and that charges for assault with intent to commit murder (1994) and theft (1987) were put on the inactive docket. Tillman had no prior criminal record.

- Agurs' pre-taxed wage earnings as a Baltimore City employee were $30,701 for 2005 and $23,766 through the first three quarters of 2006. Maria Agurs' pre-tax wage earnings were $1,686 for the fourth quarter of 2005 and $6,171 for the first two quarters of 2006. Tillman's pre-tax wage earnings were $74 for the third quarter of 2005, and he had no reported income for 2006.

- The police determined the approximate market values of the homes and vehicles belonging to Agurs, Maria Agurs, Tillman, and Conquest. The 3 Six Point Ct. home was valued at $320,000; the Ford F–150 at $35,000–$39,420; the Lexus at $46,279–$53,090; the Mercedes at $90,590–$97,275; the Ford Explorer at $8,830; the Mercury Grand Marquis at $6,360–$6,885; and the 904 Mount Holly St. home at $62,000.

Based on these asserted facts, the affidavit concludes that probable cause existed to believe that Agurs and Tillman "are participating in a conspiracy to distribute cocaine base, com-

monly known as crack cocaine" and "that the premises at 3 Six Point Court . . . and 904 Holly Street . . . are being used for the storage and distribution of narcotics, narcotics proceeds, and the facilitation of narcotics offenses." The affidavit also concludes that "evidence, fruits, and instrumentalities of the aforementioned violations of the [CDS] laws" will be found on Agurs and Tillman and at the 3 Six Point Ct. and 904 Mount Holly St. residences. The particular items to be seized included CDS, documents related to drug trafficking, drug paraphernalia, travel documents, currency, indicia of occupancy, firearms, and communication devices.

On April 6, 2007, based on this affidavit, the police obtained a warrant to search the 3 Six Point Ct. residence.[6] Members of the Baltimore City Narcotics Unit executed the warrant on April 11, 2007. In the residence, they recovered cocaine, marijuana, over $30,000 in United States currency, a digital scale, a handgun and ammunition, a Breitling watch in a "false book," a Rolex watch, paperwork, and numerous empty jars. The police also searched four vehicles parked on the property, each of which was identified in the affidavit as belonging to Agurs.[7] In the Lexus, they recovered another handgun, more ammunition, and paperwork. They recovered another Rolex watch from the Mercedes.

As explained above, Agurs asked the trial court to suppress the items seized during the search. The trial judge granted that request, concluding that there had been no substantial basis for the issuing judge to find probable cause to search Agurs' home and vehicles.[8] The State appealed and

---

6. The record does not indicate whether any other warrants were issued pursuant to the affidavit in this case.

7. The vehicles parked at the 3 Six Point Ct. residence were the Ford F–150, the Lexus, the Mercedes, and the Ford Explorer.

8. The trial court did not respond explicitly to the question of whether the officers acted in good faith reliance on the warrant. At the suppression hearing, the trial judge concluded that the warrant authorizing the search of Agurs' home and vehicles was not "justified" and granted Agurs' motion to suppress. The only specific ground that the

trial court gave for suppression of the evidence was that there was no nexus shown between Agurs' alleged "illegal activity, the home, or his vehicles." At no time, however, did he intimate that the good faith exception applied to save the warrant. Thus, when the trial judge granted Agurs' motion to suppress, the court implicitly concluded that the officers had not relied on the warrant in good faith. Therefore, we interpret the trial judge's ruling to mean that a reasonably well-trained officer would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant on the basis of what he presented. *See Malley v. Briggs,* 475 U.S. 335, 346 n. 9, 106 S.Ct. 1092, 1098–99 n. 9, 89 L.Ed.2d 271, 281 n. 9 (1986) (explaining that a police officer commits an "unacceptable error" when his or her request for a warrant is "outside the range of the professional competence expected of an officer," even if a judge issues the warrant); *Bailey v. Superior Court,* 11 Cal.App.4th 1107, 1113–14, 15 Cal.Rptr.2d 17 (1992) (holding that "[t]he totality of the circumstances presented by [the] affidavit [did] not show 'a fair probability that contraband or evidence of a crime [would] be found in a particular place' " and that "[t]he affidavit [lacked] sufficient indicia of probable cause so as to make reliance upon it unreasonable").

Although the trial court in the present case did not explicitly address the good faith issue in its ruling, we are not precluded from addressing that issue for the first time on appeal. *See Illinois v. Gates,* 462 U.S. 213, 267, 103 S.Ct. 2317, 2347, 76 L.Ed.2d 527, 567 (1983) (White, J., concurring) (explaining that the good faith standard should be measured "only by objective standards"). The good faith issue was before the trial court, as Agurs raised the issue in his motion to suppress and both parties presented argument on the issue at the suppression hearing. Regardless, this Court could properly address the good faith issue even if it had not been raised in the trial court at all. *McDonald v. State,* 347 Md. 452, 470 n. 10, 701 A.2d 675, 683–84 n. 10 (1997); *see also State v. Coley,* 145 Md.App. 502, 523 n. 14, 805 A.2d 1186, 1200 n. 14 (2002) ("[W]here there is an adequate record, the good faith inquiry may appropriately be made for the first time on appeal."); *Oesby v. State,* 142 Md.App. 144, 153, 788 A.2d 662, 667 (2002) ("[O]ur entitlement to consider the applicability of the 'good faith' exception for the first time on appeal, notwithstanding that the issue was not addressed by [the trial court], is not to be doubted."). Furthermore, the Court of Special Appeals in the present case assumed that the good faith issue was properly before it on appeal, and neither party has objected to that assumption.

Finally, nothing precluded the State from requesting an evidentiary hearing to attempt to present other circumstances for the trial court to consider in determining whether a reasonably well-trained officer would have known that the search was illegal despite the issuing judge's authorization. *United States v. Leon,* 468 U.S. 897, 922–23 n. 23, 104 S.Ct. 3405, 3420 n. 23, 82 L.Ed.2d 677, 698 n. 23 (1984) ("In making [the good faith] determination, all of the circumstances— including whether the warrant application had previously been rejected by a different magistrate—may be considered."); *see also United States v. Carpenter,* 360 F.3d 591, 599 (6th Cir.2004) (Gilman, J., concurring) ("*Leon* points out the need to consider the circumstances where extra-

the Court of Special Appeals reversed the trial judge's ruling, agreeing with the trial court that there had been no substantial basis for the warrant, but concluding that exclusion was nonetheless inappropriate because the officers had relied on the warrant in good faith. Agurs petitioned this Court for certiorari, which we granted.

## DISCUSSION

### Constitutional Principles

This case concerns our application of the "good faith" exception to the exclusionary rule, as established by the United States Supreme Court in *Leon* and applied by this Court in *Patterson* and other cases. Application of this exception involves the Fourth Amendment to the United States Constitution, *Leon*, and cases applying *Leon*.

The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

In *Patterson*, a case in which we applied the good faith exception, we discussed the Fourth Amendment's probable cause requirement as it relates to search warrants:

Probable cause has been defined by this Court as a fair probability that contraband or evidence of a crime will be

---

affidavit information might be relevant to an officer's good-faith reliance on the warrant's validity."). It is the State's burden to establish the facts to support a conclusion that the police acted in good faith in reasonable reliance upon the search warrant. *Ott v. State*, 325 Md. 206, 222–23, 600 A.2d 111, 119 (1992). By failing to request an evidentiary hearing, the State waived that right. Moreover, the State has failed to raise any concerns in either this Court or the Court of Special Appeals about its need to have had an evidentiary hearing in this case.

found in a particular place. Probable cause is a nontechnical conception of a reasonable ground for belief that the items sought will be found in the premises searched. Probable cause involves practical considerations of everyday life on which reasonable and prudent men, not legal technicians act.

Before conducting a search, ordinarily the police must obtain a search warrant that is, itself, based upon sufficient probable cause to justify its issuance as to each person or place named therein. The judge issuing that warrant must make a practical common-sense decision whether, given all the circumstances set forth in the affidavit before him [or her], including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

401 Md. at 91–92, 930 A.2d at 358 (citations and quotations omitted).

Subject to a few exceptions that are inapplicable here, a search conducted without a warrant supported by probable cause violates the Fourth Amendment's prohibition against unreasonable searches. *Belote v. State*, 411 Md. 104, 112, 981 A.2d 1247, 1252 (2009). The exclusionary rule, which was adopted by the Supreme Court in *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), and applied to the states through the Fourteenth Amendment to the United States Constitution in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), is "ordinarily . . . the appropriate remedy for a violation of the Fourth Amendment." *Myers v. State*, 395 Md. 261, 278, 909 A.2d 1048, 1058 (2006). The exclusionary rule has its limitations, however, as the Supreme Court has explained repeatedly, most recently in the Court's last term:

The fact that a Fourth Amendment violation occurred— *i.e.*, that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies. *Illinois v. Gates*, 462 U.S. 213, 223, 103 S.Ct. 2317, 76 L.Ed.2d

527 (1983). Indeed, exclusion "has always been our last resort, not our first impulse," *Hudson v. Michigan,* 547 U.S. 586, 591, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006), and our precedents establish important principles that constrain application of the exclusionary rule.

*Herring v. United States,* —— U.S. ——, 129 S.Ct. 695, 700, 172 L.Ed.2d 496, 504 (2009).

One limitation on the exclusionary rule is the good faith exception, which the Supreme Court established in *Leon.* In that case, the Court weighed "the costs and benefits of preventing the use in the prosecution's case in chief of inherently trustworthy tangible evidence obtained in reliance on a search warrant issued by a detached and neutral magistrate that ultimately is found to be defective." *Leon,* 468 U.S. at 907, 104 S.Ct. at 3412, 82 L.Ed.2d at 688. The Court concluded "that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion," *Id.* at 922, 104 S.Ct. at 3420, 82 L.Ed.2d at 698. The Court therefore held that "[i]n the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Id.* at 926, 104 S.Ct. at 3422, 82 L.Ed.2d at 700–01.

Like the exclusionary rule itself, however, this good faith exception has limits. In *Leon,* the Court explained:

> We do not suggest, however, that exclusion is always inappropriate in cases where an officer has obtained a warrant and abided by its terms. "[S]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness," *Illinois v. Gates,* 462 U.S., at 267 [103 S.Ct. 2317] (WHITE, J., concurring in judgment), for "a warrant issued by a magistrate normally suffices to establish" that a law enforcement officer has "acted in good faith in conducting the search." *United States v. Ross,* 456 U.S. 798, 823, n. 32 [102

S.Ct. 2157, 72 L.Ed.2d 572] (1982). Nevertheless, the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable, *cf. Harlow v. Fitzgerald,* 457 U.S. 800, 815–819 [102 S.Ct. 2727, 73 L.Ed.2d 396] (1982), and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued.

*Id.* at 922–23, 104 S.Ct. at 3420, 82 L.Ed.2d at 698.

The *Leon* Court outlined four situations where the good faith exception would not apply even though the police had relied on a warrant when conducting a search that was not based on probable cause. *Id.* at 923, 104 S.Ct. at 3421, 82 L.Ed.2d at 698–99. We described those situations in *Patterson:*

(1) the magistrate was mislead by information in an affidavit that the officer knew was false or would have known was false except for the officer's reckless regard for the truth;

(2) the magistrate wholly abandoned his detached and neutral judicial role;

(3) the warrant was based on an affidavit that was so lacking in probable cause as to render official belief in its existence entirely unreasonable; and

(4) the warrant was so facially deficient, by failing to particularize the place to be searched or the things to be seized, that the executing officers cannot reasonabl[y] presume it to be valid.

401 Md. at 104, 930 A.2d at 365.

Of these four situations, only the third is at issue in this case. We explained this limitation on the good faith exception in *Patterson:*

This exception under *Leon* requires the application of an objective test of a police officer's good faith reliance on the search warrant. The objective test requires that "officers, exercising professional judgment, could have reasonably believed that the averments of their affidavit related [ ] a present and continuing violation of law, not remote from the

date of their affidavit, and that the evidence sought would be likely found at [the place identified in the affidavit]." *Connelly [v. State*, 322 Md. 719, 735, 589 A.2d 958, 967 (1991) ]. The affidavit [ ] cannot be so ["]bare bones["] in nature as to suggest that the issuing judge acted as a ["]rubber stamp["] in approving the application for the warrant.[ ] *U.S. v. Wilhelm*, 80 F.3d 116, 121 (4th Cir.1996).

An affidavit that is "bare bones" is an affidavit that might be considered to be "lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" such that the *Leon* good faith exception would not apply. *Leon*, 468 U.S. at 923, 104 S.Ct. at 3421, 82 L.Ed.2d at 699. A "bare bones" affidavit is one that contains "wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause." *United States v. Laury*, 985 F.2d 1293, 1311 n. 23 (5th Cir.1993) (citation omitted).

A mistake in the probable cause determination is obvious if "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n. 23, 104 S.Ct. at 3420 n. 23, 82 L.Ed.2d at 698 n. 23. A reasonably well-trained officer should know that a warrant cannot authorize an unreasonable search and that a search warrant issued on less than probable cause is illegal. *See Leon*, 468 U.S. at 960–61, 104 S.Ct. at 3445–46, 82 L.Ed.2d at 723 (Stevens J. dissenting). Additionally, a reasonably well-trained officer must know that the affidavit he or she submits has to provide the magistrate with a substantial basis for determining the existence of probable cause. *Gates*, 462 U.S. at 239, 103 S.Ct. at 2332, 76 L.Ed.2d at 549.

401 Md. at 106–07, 930 A.2d at 367.

The appellate court's role in a case involving the good faith exception is to determine whether the officers could have reasonably relied on the warrant. As we have explained, "it is [appropriate] for the appellate court to decide whether the affidavit was sufficient to support the requisite belief that the

warrant was valid" because this is an "objectively ascertainable question." *Connelly*, 322 Md. at 735, 589 A.2d at 967; *see also McDonald v. State*, 347 Md. 452, 470 n. 10, 701 A.2d 675, 683 n. 10 (1997) ("The ultimate question of good faith *vel non* is a legal issue.") We consider "all of the circumstances of the case" in making this determination. *Patterson*, 401 Md. at 105, 930 A.2d at 365 (quoting *United States v. DeQuasie*, 373 F.3d 509, 520 (4th Cir.2004)).

We have applied the good faith exception in a number of situations, and we have typically refused to apply the limitation at issue in this case. For example, we concluded in *Patterson* that the police had relied on a warrant in good faith even though the affidavit submitted to the issuing judge asserted few facts suggesting that contraband would be found in the place to be searched. 401 Md. at 107–10, 930 A.2d at 367–69. Patterson had fled the police after a traffic stop, and the police discovered an empty holster beneath him when they tackled him. *Id.* at 82–83, 930 A.2d at 352. An eyewitness had also seen Patterson holding his hip as he ran. *Id.* at 83, 930 A.2d at 352. The police never found a gun, but they subsequently searched the vicinity of the chase and found ammunition that could be used in a gun that fit the holster. *Id.* at 83–84, 930 A.2d at 352–53. The police also discovered that Patterson had been convicted for being an accessory to murder after the fact four and a half years earlier. *Id.* at 85 n. 3, 930 A.2d at 353 n. 3. After surveilling Patterson for the next 34 days, the police applied for and received a search warrant to search for a gun and related items in a motel room that Patterson was seen frequenting. *Id.* at 84–87, 930 A.2d at 353–55; *see also* Md.Code (2003), § 5–133(c) of the Public Safety Article (prohibiting possession of a regulated firearm by individuals who have been convicted of a crime of violence).

We concluded that the warrant had been issued without a substantial basis to find probable cause. *Patterson*, 401 Md. at 103, 930 A.2d at 365. In our view, there were too few facts indicating that Patterson had a gun in the hotel room considering that so much time had passed between the arrest and the warrant application and that there were no facts connect-

ing Patterson to ongoing criminal activity. *Id.* at 101–03, 930 A.2d at 364–65. We nonetheless held that the officer's reliance on the warrant was "objectively reasonable" and that exclusion was inappropriate because "[t]he warrant application provided, although substantially weak, some indicia of probable cause." *Id.* at 108, 930 A.2d at 367–68.[9] We also noted that each of the lower courts reviewing the warrant application had upheld the warrant, which further indicated that the officers' reliance on the warrant was reasonable. *Id.* at 109, 930 A.2d at 368.

We have applied the good faith exception in other cases and similarly determined that the third limitation to that exception did not require exclusion. In *McDonald,* marijuana was discovered in a package to be delivered to McDonald's home and, based on that discovery, a warrant was issued to search his home. 347 Md. at 456–58, 701 A.2d at 677–78. The warrant was not conditioned on delivery of the package to the home. *Id.* at 461, 701 A.2d at 679. Accordingly, McDonald argued that the warrant was an anticipatory warrant and that, as a result, there had been no probable cause to issue it. *Id.* at 456, 701 A.2d at 677. We chose to address the good faith issue without deciding whether probable cause was lacking, holding that "the affidavit was not so lacking in indicia of probable cause that it was unreasonable for the officers to rely upon it" because the police "were aware of the contents of the package, the package's weight, the delivery address, and the use of what appear[ed] to be a fictitious name" on the package. *Id.* at 469–70, 472, 701 A.2d at 683–84. We came to a similar conclusion in *Minor v. State,* where we held that although the affidavit provided no information about the confidential sources upon which the applying officer had relied, it did note particular facts that the informant had told the police officer

9. Specifically, the indicia of probable cause in *Patterson v. State* included the empty gun holster found beneath Patterson, the ammunition found near where Patterson was arrested, eyewitness accounts that Patterson had been holding his hip as he ran, Patterson's criminal history, and the fact that the police gathered the information from first-hand observation. 401 Md. 76, 108–09, 930 A.2d 348, 368 (2007).

about the location of the goods to be recovered, about the goods themselves, about the location from which the goods had been stolen, and about the time when they were stolen. 334 Md. 707, 715–20, 641 A.2d 214, 217–19 (1994).

We also found good faith on the part of the police officers in *Connelly,* 322 Md. at 735, 589 A.2d at 967. A warrant to search Connelly's home and store had been issued pursuant to an affidavit that failed to provide specific dates for the surveillance upon which it was based. *Id.* at 733–34, 589 A.2d at 965–67. We held that exclusion of the evidence recovered was still inappropriate because the affidavit could be read in one of two ways: as either "presenting stale probable cause" or indicating "that the affiants . . . were describing a continuing criminal enterprise, ongoing at the time of their application, and thus the probable cause relied upon was not stale." *Id.* at 734, 589 A.2d at 966. We concluded that because, under these circumstances, "reasonable minds may differ as to the correct determination," the officers could have relied upon the affidavit in good faith. *Id.* at 735, 589 A.2d at 967.

We have not, however, always refused to apply the third limitation to the good faith exception. In *Greenstreet v. State,* we concluded that the police could not have relied on the warrant in good faith because the affidavit submitted to the issuing judge asserted stale facts. 392 Md. 652, 682–83, 898 A.2d 961, 979 (2006). The affidavit stated that the police had searched Greenstreet's trash, but—perhaps due to a typographical error—it also stated that the search was performed 11 months before any other evidence was gathered and one year before the warrant was issued. *Id.* at 682, 898 A.2d at 979. Considering the remoteness of this evidence, we concluded that "the lack of probable cause [was] apparent on the face of the affidavit." *Id.* at 683, 898 A.2d at 979. Accordingly, we held that the evidence recovered during the search should be excluded. *Id.*

These cases present some generally applicable principles regarding the third limitation to the good faith exception. This limitation is inapplicable where there is "some indicia of

probable cause." *See Patterson,* 401 Md. at 108, 930 A.2d at 368; *McDonald,* 347 Md. at 472, 701 A.2d at 685. It is also inapplicable when reasonable minds might disagree about its applicability. *See Connelly,* 322 Md. at 735, 589 A.2d at 967. It will apply, however, when the absence of probable cause "is apparent on the face of the affidavit." *Greenstreet,* 392 Md. at 683, 898 A.2d at 979. With these principles in mind, we turn to the facts of the present case.

## Analysis

Our only inquiry in this case is whether the evidence recovered during the search of Agurs' home should be excluded or whether the *Leon* good faith exception to the exclusionary rule applies, making exclusion inappropriate.[10] We shall conclude that the evidence should be excluded because the affidavit submitted to the issuing judge lacked any indicia of probable cause supporting the conclusion that drugs would be found in Agurs' home. Furthermore, the affidavit provided limited facts suggesting that Agurs was involved with drug distribution. Under these circumstances, no reasonably well-trained police officer could have relied on the warrant that authorized the search of Agurs' home.

In his brief filed in this Court, Agurs argues that the third limitation to the good faith exception makes exclusion appropriate, *i.e.,* "the warrant was based on an affidavit that was so lacking in probable cause as to render official belief in its existence entirely unreasonable." *Patterson,* 401 Md. at 104, 930 A.2d at 365. He bases this argument on several contentions: (1) the police should have realized that a nexus between criminal activity and the place to be searched is necessary for probable cause to exist, (2) the affidavit was so lacking in indicia of a nexus that the police could not have reasonably believed probable cause existed, (3) there was no substantial

---

**10.** We need not determine whether there was a substantial basis to issue the warrant authorizing the search in this case. The Court of Special Appeals concluded that there was no substantial basis to issue the warrant, and we did not grant certiorari on that issue.

basis for the issuing judge to find probable cause of Agurs' involvement with drugs, and (4) the warrant was over-inclusive such that the police could not have relied on it in good faith.[11] In response, the State asserts that the police reasonably relied on the warrant because: (1) the warrant was not based on purely conclusory statements, (2) the warrant had some indicia of probable cause, (3) a nexus may be established by the police officer's knowledge based on the officer's training and experience, (4) the affidavit does establish a nexus, and (5) the warrant was not over-inclusive.

## A.

### Nexus Requirement

■ We first consider whether the police should have been aware that there must be a nexus between criminal activity and the place to be searched. The Court of Special Appeals concluded that this nexus requirement is a "fine legal detail" that officers could not be required to know. We disagree. As we explained in *Greenstreet*, "[a] well-trained police officer is required to be aware of well-established current law and to have a reasonable knowledge of what the law prohibits." 392 Md. at 679, 898 A.2d at 977. Our interpretation of the nexus requirement is sufficiently well-established that the police must be aware of it.

We explained extensively the nexus requirement in *Holmes v. State*, 368 Md. 506, 796 A.2d 90 (2002), where we considered whether there had been probable cause to search Holmes' residence when he was known to have been selling cocaine. We held that probable cause to search Holmes' residence could be based on inferences, as opposed to direct evidence, that suggested contraband would be found there:

11. The State correctly points out that Agurs has mistakenly posed each of these arguments in his brief as a "Question Presented." We granted certiorari on the specific question originally posed by Agurs in his petition for certiorari and quoted earlier in this opinion, not on the four questions posed by Agurs in his brief.

Direct evidence that contraband exists in the home is not required for a search warrant; rather, probable cause may be inferred from the type of crime, the nature of the items sought, the opportunity for concealment, and reasonable inferences about where the defendant may hide the incriminating items. The thrust of [cases stating this rule] was characterized by the court in [*United States v. Thomas*, 989 F.2d 1252, 1255 (D.C.Cir.1993) ], in a unanimous *per curiam* opinion by a panel that included now Supreme Court Justice Ruth Bader Ginsburg, that "observations of illegal activity occurring away from the suspect's residence, can support a finding of probable cause to issue a search warrant for the residence, *if there is a reasonable basis to infer from the nature of the illegal activity observed, that relevant evidence will be found in the residence.*"

*Holmes*, 368 Md. at 522, 796 A.2d at 100 (citations omitted).

Although we concluded that direct evidence that contraband will be found in a suspected criminal's home is not required to establish probable cause to search that home, we also explained that the suspect's alleged participation in criminal activity, on its own, would not necessarily be enough:

[T]he mere observation, documentation, or suspicion of a defendant's participation in criminal activity will not necessarily suffice, by itself, to establish probable cause that inculpatory evidence will be found in the home. There must be something more that, directly or by reasonable inference, will allow a neutral magistrate to determine that the contraband may be found in the home.

*Id.* at 523, 796 A.2d at 100–01 (citations omitted). We concluded that a nexus existed between Holmes' alleged drug sales and his home because, among other things, the police had observed Holmes in a drug transaction that occurred less than a block from his home, they had seen him frequently enter and exit his home around the time of the transaction, and they had discovered drugs on him before they conducted the search. *Id.* at 523, 796 A.2d at 101.

The Court of Special Appeals considered the nexus requirement soon after our decision in *Holmes*. In *State v. Coley*, the intermediate appellate court noted "that some jurisdictions have held that there is probable cause to believe that drug dealers will keep drugs and records of the drug trade in their homes," but the court refused to adopt that rule. 145 Md. App. 502, 527 n. 18, 805 A.2d 1186, 1202 n. 18 (2002). The Court of Special Appeals instead noted that Maryland "has explicitly rejected this notion" and that

[t]he approach used by Maryland ... and other jurisdictions requires some nexus be established, even in the absence of direct evidence, between the nature of the items sought and the place where they are to be seized.

*Id.* at 527–28 n. 18, 805 A.2d at 1202 n. 18 (citing *Holmes*, 368 Md. at 523, 796 A.2d at 101).

The Court of Special Appeals concluded in *Coley* that the affidavit established a nexus between Coley's alleged drug sales and his home because it asserted several important facts: the officers believed that drug traffickers in the county in question were likely to store contraband in their homes; an informant had stated that there was a connection between Coley's drug sales and his home; and Coley entered and exited his home before and after controlled buys. *Id.* at 530–31, 805 A.2d at 1204. Although the intermediate appellate court determined that this established a sufficient nexus between Coley's alleged drug sales and his home to justify the warrant authorizing the search, it also noted that, "[a]s in *Holmes*, we do not 'determine whether an isolated drug transaction, especially if it were to occur some considerable distance from the home, will suffice, because here there was additional evidence connecting the transaction to the home.'" *Id.* at 531 n. 19, 805 A.2d at 1204 n. 19 (quoting *Holmes*, 368 Md. at 523, 796 A.2d at 101).

█ As *Holmes* and *Coley* suggest, we have never provided a definitive test for establishing whether a sufficient nexus exists between alleged criminal activity and the suspected criminal's home. These cases do, however, establish some

relevant principles. As evidenced by *Holmes*, there is more likely to be probable cause to search a suspected drug dealer's home when the police have seen the suspect engage in a drug sale near his home, when the police have found drugs on the suspect before the search, and when the defendant has been in and out of his home near the time of the drug sale. These factors support the "reasonable inference . . . that the contraband may be found in the home." *Holmes*, 368 Md. at 523, 796 A.2d at 101; *see also Coley*, 145 Md.App. at 530–31, 805 A.2d at 1204 (asserting similar facts). On the other hand, there must be facts shown from which this reasonable inference may be drawn. *Holmes*, 368 Md. at 523, 796 A.2d at 100. Our decision in *Holmes* twice states that a suspect's home cannot be searched unless there are facts supporting a reasonable inference that contraband might be found there, 368 Md. at 522–23, 796 A.2d at 100–01, and the Court of Special Appeals reiterated that requirement in *Coley*, 145 Md.App. at 526, 530, 805 A.2d at 1201, 1204. We conclude that these principles are sufficiently well-established that the police must be aware of them.[12]

## B.

### *Good Faith*

■ Applying the principles from *Holmes* and *Coley* to this case, we further conclude that no reasonably well-trained police officer could have relied in good faith on the warrant

---

12. We do not suggest that the good faith exception can never apply when a reviewing court determines that an affidavit failed to satisfy the nexus requirement. There will undoubtedly be circumstances where "reasonable minds may differ" as to whether the nexus requirement was satisfied. *Connelly v. State*, 322 Md. 719, 735, 589 A.2d 958, 967 (1991); *see also Patterson*, 401 Md. at 109, 930 A.2d at 368 (noting, when applying the good faith exception in a case involving the nexus requirement, that "the application for the search warrant provided sufficient evidence to create disagreement among thoughtful and competent judges as to the existence of probable cause"). An officer cannot, however, rely in good faith on a warrant that was based upon an affidavit that completely fails to establish a reasonable inference that contraband might be found in the place to be searched. *Holmes v. State*, 368 Md. 506, 522–23, 796 A.2d 90, 101 (2002).

authorizing the search of Agurs' home. Not only did the affidavit submitted to the issuing judge lack any indicia of probable cause that the nexus requirement was satisfied, it also provided limited facts suggesting that Agurs was involved with drug distribution.

As we have explained, we have interpreted the Fourth Amendment to require a reasonable inference that contraband may be found in a suspect's home before there will be probable cause to search there. *Holmes*, 368 Md. at 523, 796 A.2d at 101. In its opinion below, the Court of Special Appeals explained how the affidavit in this case completely failed to establish such an inference:

> There are only two items in the affidavit that might arguably establish a nexus between Agurs's criminal activity and his house. The first is the police officers' assertion, based on their significant training, experience, and expertise, that drug dealers often store drugs, cash, records, and other evidence of drug law violations in their residences. Such an assertion in an affidavit has some significance in determining whether there is a substantial basis to conclude police will actually find evidence at a drug dealer's home. *Coley, supra,* 145 Md.App. at 530–31 [805 A.2d 1186]. In *Coley,* however, we did not hold that a defendant's status as a drug dealer entitles the police to search the defendant's home. To the contrary, we noted that Maryland has in the past rejected the notion that it is always reasonable to predict that evidence of crime will be found in the residence of a known drug dealer.

> \* \* \* \*

In *Coley,* we concluded an adequate nexus was provided by the evidence that Coley had engaged in drug transactions immediately after leaving the residence. In contrast, the affidavit in Agurs's case described no drug transaction that had any connection with the residence. The incident involving the clothing store on March 30, 2007, did not provide any nexus between the residence and drugs. To recount: Police observed Agurs exit his house and drive his

Ford F–150 to the 2800 block of W. Lafayette Avenue in the Baltimore neighborhood of Mosher. Agurs parked, exited his truck, and waited five minutes until a Nissan Infiniti pulled up in the same block. An unidentified man exited the passenger seat, approached Agurs, and the two entered a clothing store on the block together. The Nissan waited while about a minute of time passed. Then, according to the affidavit, "the unknown male slowly exited the store cautiously looking around in each direction. It was observed [that] this unknown male had a bulge in his right pocket, which was not previously noticeable." Agurs exited the store immediately behind the unidentified man. The latter got into the Nissan, which drove away. Agurs got into his Ford F150 and drove to the auto detail shop where he ultimately met Tillman, after which he drove away and the surveillance ended.

Upon consideration of these facts, the Court of Special Appeals held that the conclusion that Agurs had drugs in his home "from such ambiguous observations would require so much speculation that we are unable to agree that the issuing judge could reasonably find a nexus based on that portion of the affidavit." We agree with the Court of Special Appeals that a nexus in this case could only be based on unreasonable speculation and further conclude that such unreasonable speculation cannot provide the basis for a reasonable inference that contraband might be found in a suspect's home.

We disagree, however, with the Court of Special Appeals' conclusion that the affidavit asserted "enough information for the police officers to have believed, in good faith, that the issuing judge properly issued a valid warrant." While the affidavit included a significant number of facts about Agurs and Tillman, it failed to assert any facts suggesting a nexus between drugs and Agurs' home. As the Court of Special Appeals noted, the only factual assertion that could have possibly suggested such a nexus was that Agurs once left his home and met with another individual who subsequently had a previously unnoticed bulge in his pocket. This single assertion, which could have a number of innocent explanations, does

not constitute indicia of probable cause that drugs might be found in Agurs' home. Without such indicia, the lack of probable cause is "apparent on the face of the affidavit" and the police could not have relied on the warrant in good faith. *See Greenstreet,* 392 Md. at 683, 898 A.2d at 979.

The State, citing *Patterson,* argues that the good faith exception nonetheless applies because the warrant was "based on more than purely conclusory statements." We again disagree. Merely including non-conclusory statements in a warrant application does not necessarily make the good faith exception applicable. While the affidavit in this case does include a significant number of assertions, some of which may not be conclusory, it lacks any assertions establishing a reasonable inference that drugs might be found in Agurs' home. For example, the State points to statements from confidential sources implicating Agurs in drug distribution and to facts suggesting that the sources were reliable. These statements, whether conclusory or not, establish no relationship between drugs and Agurs' home. The State points to two assertions that do relate to Agurs' home—the fact that he lives there and keeps "expensive assets" there—but these bear no relation to drugs. The single assertion that the State claims would establish an inference that Agurs keeps drugs in his home is the police officers' own "belief that they would find evidence of Agurs's illegal drug distribution conspiracy at this residence." This is precisely the sort of conclusory statement that cannot provide the basis for probable cause.

The State argues, however, that "[t]he expertise of police officers along with circumstantial evidence is sufficient to establish [a] nexus." That has never been our interpretation of the Fourth Amendment.[13] To support its argument, the

---

13. The State supports this contention almost entirely with cases from various federal circuit courts, none of which change our conclusion. The warrant authorizing the search of Agurs' home was obtained by Baltimore police officers from a Maryland state court seeking to arrest Agurs for Maryland state crimes. Although we certainly consider federal court decisions when interpreting the United States Constitution, it is our interpretation of the Fourth Amendment, confined by

State cites our decision in *Holmes*[14] and the Court of Special Appeals' decision in *Coley*,[15] but, as we have explained, the nexus in each of those cases was based on more than just police officers' assertions. The State also cites *Patterson*, but the affidavit in *Patterson* asserted several facts that suggested a gun would be found in the hotel room Patterson was seen frequenting. Patterson, a convicted felon, fled the police after

United States Supreme Court precedent, that is relevant to the police officer's understanding of the nexus requirement in this case. *See United States ex rel. Lawrence v. Woods*, 432 F.2d 1072, 1076 (7th Cir.1970) ("[B]ecause lower federal courts exercise no appellate jurisdiction over state tribunals, decisions of lower federal courts are not conclusive on state courts."); *see also Lockhart v. Fretwell*, 506 U.S. 364, 376, 113 S.Ct. 838, 846, 122 L.Ed.2d 180, 193 (1993) (Thomas, J., concurring) ("[A] state trial court's interpretation of federal law is no less authoritative than that of the federal court of appeals in whose circuit the trial court is located."); *Whitfield v. Warden of Maryland House of Correction*, 355 F.Supp. 972, 977 (D.Md.1973) (noting that the Federal District Court for the District of Maryland must follow Fourth Circuit precedent, "even if the courts of the State of Maryland may not be so bound"), *rev'd on other grounds*, 486 F.2d 1118 (4th Cir.1973); *French v. Hines*, 182 Md.App. 201, 262 n. 21, 957 A.2d 1000, 1035 n. 21 (2008) ("Maryland courts are not obligated to follow the decisions of the lower federal courts, even as to questions of federal law.").

**14.** In citing *Holmes*, 368 Md. at 521–22, 796 A.2d at 100, the State relies on the following passage:

> The reasoning, supported by both experience and logic, is that, if a person is dealing in drugs, he or she is likely to have a stash of the product, along with records and other evidence incidental to the business, that those items have to be kept somewhere, that if not found on the person of the defendant, they are likely to be found in a place that is readily accessible to the defendant but not accessible to others, and that the defendant's home is such a place.

This passage is both dicta and taken out of context. We stated that a person who deals drugs is likely to have a stash of the product and, if the person did not have that stash on him or herself, it was likely to be in some other place. We suggested that one such place would be that person's home. We never said, however, that this string of inferences was sufficient to establish probable cause to search the person's home.

**15.** The State relies on *Coley*, 145 Md.App. at 530–31, 805 A.2d at 1204, for the proposition that " '[d]eference is to be given to the experience of police officers,' specifically as it applies to knowledge that drug traffickers are likely to store information related to their drug activity at their residences." As discussed in this opinion, the Court of Special Appeals gave weight to the police officers' experience as just one factor leading to its determination that a nexus had been established in *Coley*.

a routine traffic stop, he was seen holding his hip while running from the police, there was an empty holster beneath him when he was arrested, ammunition was found in the area where he was arrested, and the police could not find a gun at the scene of the arrest. *Patterson,* 401 Md. at 108–09, 930 A.2d at 368. The inference to be drawn from these facts was that Patterson had returned to the scene of the chase and retrieved the gun, and that either the gun or evidence of his illegal possession of the gun would be found in his hotel room. Although the facts suggesting Patterson had a gun in his hotel room were "substantially weak," we held that these facts provided some indicia of probable cause that the nexus requirement was satisfied. *Id.* at 107–08, 930 A.2d at 368. In contrast, the affidavit in this case provided no such indicia. The police never saw Agurs with drugs of any kind, and he never exhibited any behavior that could not be easily interpreted as innocent.[16]

*Patterson* is distinguishable from the present case in other ways. The defendant in *Patterson* had a number of recent arrests, including arrests for five offenses within a year of the search, and at least one conviction, for being an accessory to murder after the fact, less than five years before the search. *Id.* at 85–86 n. 3, 930 A.2d at 353–55 n. 3. In addition, each of the judges who had previously considered the warrant in *Patterson* had concluded that there was a substantial basis for the issuing judge to find probable cause. *Id.* at 109, 930 A.2d at 368; *see also Connelly,* 322 Md. at 735, 589 A.2d at 966–67 (explaining that good faith might be found when "reasonable minds may differ" as to whether probable cause existed).

---

**16.** In a recent Court of Special Appeals decision discussing *Patterson,* Judge Moylan explained that the third limitation to the good faith exception "was clearly intended to deal with warrant applications which were nothing beyond mere conclusions and was not intended to deal with fuller warrant applications that turned out, on further legal examination, to be somehow flawed." *State v. Jenkins,* 178 Md.App. 156, 203, 941 A.2d 517, 544 (2008). The affidavit in the present case includes many assertions, but it presents "nothing beyond mere conclusions" in regard to the nexus requirement. It is therefore encompassed by the third limitation to the good faith exception.

Agurs, on the other hand, had no convictions within five years of the search and no CDS-related convictions within 15 years. Furthermore, each court reviewing the affidavit in the present case has agreed that it could not have possibly satisfied the nexus requirement. In our view, the warrant in *Patterson* fell into a grey area in which an officer could have relied on it in good faith; the warrant in this case did not.

■■■ The State's good faith argument is further weakened by the fact that the affidavit failed to provide a substantial basis to find probable cause that Agurs was involved with drug distribution. The Court of Special Appeals noted that many of the assertions suggesting Agurs was involved with drug distribution are "speculat[ive]," "inconclusive," or have "minimal" probative value:

> The affidavit provides some evidence that Agurs and his wife were living beyond what their recent wages could support, but, as the suppression court noted, we can only speculate as to where the extra money came from. Additionally, the affidavit describes what would have been a drug deal between Agurs and an unidentified man at a clothing store, but, as discussed below, this also was too inconclusive for the issuing judge to draw any inference of criminal conduct.
>
> The affidavit also provides Agurs's criminal record, which does include drug law violations. Past convictions for drug law violations are relevant to determining whether there is probable cause to believe a suspect is currently dealing drugs. [*State v. Jenkins*, 178 Md.App. 156, 187, 941 A.2d 517, 535 (2008) ] (citing *Gatewood v. State*, 244 Md. 609, 616 [224 A.2d 677] (1966)). Nevertheless, Agurs's criminal record, by itself, would not justify even a reasonable suspicion that he was involved in criminal activity. *See State v. Nieves*, 383 Md. 573, 597 [861 A.2d 62] (2004) ("to allow the reasonable articulable suspicion standard to be satisfied based upon a person's [criminal] status, rather than an individualized assessment of the circumstances, would undermine the purpose [of] requiring officers to justify their reasons for searching a particular individual."). Moreover,

the probable value of Agurs's convictions is minimal because they date back about twenty years.

The Court of Special Appeals further explained that although the informant, CI–2440, who identified Agurs as a distributor of cocaine, had a history of reliability, the affidavit articulates "barely any basis of personal knowledge upon which the informant could claim that Agurs was involved in cocaine distribution." The intermediate appellate court also noted that CI–2440 told the police that Agurs worked for the City of Baltimore, although a tip from an informant "must provide something more than facts or details that are readily visible to the public." *Dixon v. State,* 133 Md.App. 654, 697, 758 A.2d 1063, 1086 (2000); *see also Lee v. State,* 311 Md. 642, 655, 537 A.2d 235, 241 (1988) (explaining that the State was required "to present proof that the informer knew factual details about the crime beyond that which could be acquired by any person who for any reason whatsoever was interested in publicly reported facts").

The Court of Special Appeals did determine, however, that some of the assertions in the affidavit support the conclusion that Agurs was involved with drug distribution. CI–2440, who had a record of reliability, told the police that Agurs had a "cousin" named "Dru" who assisted Agurs with his drug activities. A second informant, CI–3232, twice participated in controlled buys of drugs from Tillman and told the police that Tillman's nickname was "Dru." The intermediate appellate court considered these facts important because the affidavit also established that Agurs and Tillman were acquainted and that the two had met in a "manner in which other persons suspected of dealing in narcotics had interacted with Tillman." In addition, other unidentified and uncorroborated confidential informants had named Agurs as an upper-level distributor of cocaine. The Court of Special Appeals concluded that based on these assertions, "the issuing judge had a substantial basis to find probable cause that Agurs was *somehow* involved with Tillman in the distribution of cocaine." (Emphasis added.)

We do not accept this conclusion. As an initial matter, we do not apply the substantial basis standard in this

case. We apply the substantial basis standard when reviewing a judge's decision to issue a search warrant, *see Birchead v. State,* 317 Md. 691, 701, 566 A.2d 488, 492–93 (1989), but that is not the issue before us. There is no question that the warrant in this case should not have been issued; the Court of Special Appeals concluded as such, and we denied the State's request to review that conclusion. The question before us is whether the officers relied in good faith on the warrant, as issued, and we make that determination as a matter of law, *McDonald,* 347 Md. at 470 n. 10, 701 A.2d at 683 n. 10, upon a review of all the facts set forth in the affidavit, *Connelly,* 322 Md. at 735, 589 A.2d at 966–67. The warrant in this case was based on Agurs' alleged involvement with drug distribution, so, in making the good faith determination, we shall consider the strength of the facts in the affidavit suggesting that Agurs was involved with drug distribution. The weaker those facts are, the less reasonable it was for the police to rely on the warrant.

As the Court of Special Appeals explained, most of the facts asserted in the affidavit establish only an inconclusive connection between Agurs and drug distribution. For example, the police discovered a number of facts about Agurs through their own investigation: he seemed to be living beyond his means; he entered a clothing store with an individual who left the store with a bulge in his pocket; he had a criminal record. As the Court of Special Appeals noted, however, "the police observed no drugs and no transaction" involving Agurs. Instead, their observations supported nothing more than mere speculation that Agurs was involved in drug distribution. *Cf. Ransome v. State,* 373 Md. 99, 111, 816 A.2d 901, 908 (2003) (finding no reasonable suspicion to frisk an individual who was in a high-crime area at night, with a bulge in his pocket, and was acting nervous around three un-uniformed police officers who approached him).

The informants' assertions are similarly inconclusive. CI–2440 told the police that someone named "G," who CI–2440 identified as Agurs, worked for the City of Baltimore and was an upper-level drug distributor and that a "cousin," known as

"Dru," assisted Agurs in this endeavor. As the Court of Special Appeals noted, however, the affidavit provided no basis for these assertions other than CI–2440's "street level observations." In addition, CI–2440 apparently asserted no facts suggesting that he or she had personal knowledge about Agurs or his alleged drug distribution, such as predictive details about Agurs or any specific, non-public details about him. *Cf. Herod v. State,* 311 Md. 288, 295, 534 A.2d 362, 365 (1987) (explaining that an informant's reliability was enhanced when she related "a dozen specific facts" about the defendant, ten of which the police corroborated); *Massey v. State,* 173 Md.App. 94, 109, 917 A.2d 1175, 1183 (2007) (explaining that an informant's reliability "was enhanced when his statements about Massey's future actions were verified"). As for the other confidential informants who made assertions about Agurs, the Court of Special Appeals correctly noted that the affidavit provided no information about them.

Little else suggests that CI–2440's statements are reliable. We recognize that, according to the affidavit, CI–2440 had supplied the police with reliable information in the past, which suggests that CI–2440's statements about Agurs were also reliable. *State v. Rucker,* 374 Md. 199, 214, 821 A.2d 439, 448 (2003) ("Whether a source is known to police or not is highly probative in determining whether the tip provided by the source is reliable...."). Contrary to the Court of Special Appeals' conclusion, however, the statements were lacking in any independent corroboration. Other than the publicly-available fact that Agurs worked for the City of Baltimore, the police in this case did not verify any of the assertions that CI–2440 made about Agurs. CI–2440 told the police that a "cousin," known as "Dru," assisted Agurs with drug distribution. A second informant, CI–3232, purchased drugs from Tillman and told the police that Tillman was known as "Dru." For all this might suggest about Tillman, it does not connect Agurs to drug distribution. It certainly does not corroborate CI–2440's assertion that "Dru" was assisting Agurs with drug distribution. The meeting between Agurs and Tillman similarly fails to corroborate CI–2440's assertion about Agurs. The fact that the two men met does not establish that they

were involved in a drug distribution conspiracy, especially considering that the police apparently saw no exchange of anything, not to mention drugs, during the meeting. Other than a history of reliability, we see nothing that suggests that CI–2440's assertions about Agurs were reliable.

The limited nature of the facts suggesting that Agurs was involved in drug distribution further establishes that the police officers' reliance on the warrant was unreasonable. Our cases support this conclusion, as neither this Court nor the Court of Special Appeals has ever found a nexus when the affidavit asserted such limited facts about the suspect's alleged criminal activity. For example, the affidavit in *Holmes* asserted that the police had seen Holmes engage in drug transactions and that they discovered drugs on him before the search of his residence. 368 Md. at 523, 796 A.2d at 101. Similarly, the affidavit in *Coley* explained that the police had orchestrated two controlled buys of drugs from Coley. 145 Md.App. at 531, 805 A.2d at 1204. In *Patterson*, the affidavit established not only that Patterson had fled from the police after a routine traffic stop, but also that he was a recently convicted felon who appeared to have been illegally carrying a gun. 401 Md. at 108–09, 930 A.2d at 368. In this case, the Court of Special Appeals concluded only that Agurs was "somehow" involved with drugs, based entirely on inconclusive facts, uncorroborated statements by an informant with no stated personal knowledge to support those statements, and statements by unidentified and entirely uncorroborated informants. We are aware of no published cases where a nexus was established under such limited facts regarding the suspect's alleged criminal activity.[17]

The limited nature of the facts suggesting that Agurs was involved with drug distribution underscores our conclusion that the affidavit in this case completely failed to support a

---

17. Federal cases also support our conclusion. In every federal case that the State has cited in support of its nexus argument, there were significant facts implicating the defendant in criminal activity that provided some justification for the search. *See United States v. Williams*, 548 F.3d 311, 320 (4th Cir.2008) ("extensive evidence of [the

reasonable inference that Agurs had drugs in his home. To draw the inference that Agurs had drugs in his home, two factual leaps were necessary. First, the issuing judge had to infer that Agurs was involved with drug distribution based upon speculative assertions, the allegations of an uncorroborated informant who indicated no personal knowledge of Agurs' alleged criminal activities, and the allegations of unidentified and entirely uncorroborated informants. Second, based on that inference, the issuing judge had to infer that Agurs was likely to have drugs in his home, even though there were no indicia of probable cause to support this conclusion. We conclude that no reasonably well-trained police officer could have believed there was probable cause to search Agurs' home under these circumstances. Accordingly, the evidence recovered during that search must be excluded.[18]

---

defendant's] drug trafficking activities"), *cert. denied,* —— U.S. ——, 129 S.Ct. 1922, —— L.Ed.2d —— (2009); *United States v. Ross,* 487 F.3d 1120, 1121–22 (8th Cir.2007) (confidential source delivered 100 pounds of drugs to defendant); *United States v. Nolan,* 199 F.3d 1180, 1182 (10th Cir.1999) (informant purchased drugs from defendant during investigation); *United States v. Broussard,* 80 F.3d 1025, 1035 (5th Cir.1996) (defendant seen handling drugs several times), *cert. denied,* 519 U.S. 906, 117 S.Ct. 264, 136 L.Ed.2d 189 (1996); *United States v. Sleet,* 54 F.3d 303, 305 (7th Cir.1995) (defendant matched the eyewitness description of a man seen robbing a bank and seen fleeing in the direction of the defendant's apartment); *United States v. Pitts,* 6 F.3d 1366, 1366–69 (9th Cir.1993) (defendant delivered drugs to a cooperating witness), *United States v. Restrepo,* 994 F.2d 173, 178–80 (5th Cir.1993) (defendant extensively involved with drug smuggling scheme). Even in *United States v. Grossman,* 400 F.3d 212, 214–15 (4th Cir. 2005), in which an informant's allegation alone led the police to believe that the defendant was involved in drug dealing, the police had discovered a number of facts suggesting that the defendant was hiding something in his home. Grossman had taken a suspicious route to his home and subsequently made several "plainly false statements" to the police about this home, including an assertion that he had not been inside even though the police had just seen him exit the front door. *Id.* at 215. More than any facts asserted in the present case, these false statements supported a reasonable inference that Grossman might have had contraband in his residence.

**18.** We need not consider Agurs' argument that portions of the warrant were facially invalid because we have rejected application of the good faith exception for the reasons discussed in this opinion.

## CONCLUSION

The affidavit submitted to the issuing judge in this case was lengthy and detailed, but those qualities alone will not satisfy the Fourth Amendment. The affidavit must still assert facts that establish probable cause to justify the proposed search or seizure. Police officers cannot compensate for a lack of probable cause by submitting a lengthy affidavit and issuing judges must read carefully warrants and applications to ensure that this requirement is met.

We have interpreted the Fourth Amendment to require a reasonable inference that contraband may be found in a suspect's home before there will be probable cause to search that home. In this case, the police submitted an affidavit that completely failed to satisfy that requirement. The affidavit provided no indicia of probable cause that this requirement was met and provided limited facts suggesting that the suspect was involved with criminal activity. We conclude that no reasonably well-trained police officer could have relied upon this warrant in good faith.

*THE JUDGMENT OF THE COURT OF SPECIAL APPEALS IS REVERSED. THE CASE IS REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY. BALTIMORE COUNTY TO PAY THE COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.*

BATTAGLIA, J., joins in the Judgment only.

MURPHY, J. concurs and dissents.

ADKINS and BARBERA, JJ., dissent.

Concurring & Dissenting Opinion by MURPHY, J., which ADKINS, J., joins.

While I join part A. of Judge Green's opinion, I am persuaded that the case at bar is such a "close" case that an evidentiary hearing is necessary to determine whether the

"good faith" exception is applicable.[1]   While I recognize that both the United States Supreme Court and this Court have previously resolved this issue by merely examining the "four corners" of the affidavit presented in support of the search warrant,[2] and have never ordered a remand for an evidentiary hearing on the "good faith" issue alone, neither court has expressly prohibited such a procedure. While the fact that a search warrant has issued may "normally" suffice to establish that the officers acted in good faith, there is no reason why the case at bar should be resolved in Petitioner's favor without giving the State an opportunity to present evidence on the "good faith" issue.[3]

There are two well recognized exceptions to the "four corners" rule.  This Court has held that an evidentiary hearing is required to determine whether probable cause for the issuance of a search warrant was "tainted," i.e. acquired by illegal electronic surveillance or by what was observed during an unconstitutional warrantless search. *Carter v. State*, 274 Md. 411, 443, 337 A.2d 415, 433 (1975); *Everhart v. State*, 274 Md. 459, 478–79, 337 A.2d 100, 111 (1975).  Under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), a defendant is also entitled to an evidentiary hearing to determine whether certain information in an affidavit must be redacted on the ground that the information at issue is false.[4]

---

**1.**  As is obvious from the opinions of Judge Greene and Judge Barbera, the case at bar is a "close" one.

**2.**  Under the "four corners" rule, "the court must confine itself to the affidavit itself and may not go outside its 'four corners' in determining the existence of probable cause." *Everhart v. State*, 274 Md. 459, 478–79, 337 A.2d 100, 111 (1975).

**3.**  Although the State did not make such a request of the suppression hearing court, because the State prevailed in the Court of Special Appeals, I would not decline to remand for an evidentiary hearing on "waiver" grounds.

**4.**  At the conclusion of a *Franks* hearing, if the suppression hearing court is persuaded that (1) the affidavit contains a false statement of material fact, and (2) the affiant either had actual knowledge that the statement was false or would have realized that the statement was false

These cases are entirely consistent with my opinion that, when a suppression hearing court concludes that a search warrant should not have been issued because the affidavit failed to establish the existence of probable cause, the court should grant the State an opportunity to establish—by a preponderance of the evidence—that the search was conducted in good faith. I would hold that, while the State should be required to prove that the officers actually *did* rely in good faith upon the warrant,[5] the State should not be denied the opportunity to do so.

In *Winters*, this Court noted that "considerable credit can be given to the expertise of law enforcement officers." *Id.* at 228, 482 A.2d at 893. An officer's "expertise," or lack thereof, may be critical to the issue of whether that officer actually did—or did not—act in good faith when preparing the affidavit that failed to establish probable cause. For example, if this member of the Court were presiding at a "good faith" evidentiary hearing in the case at bar, I would grant Petitioner's motion for suppression if the evidence showed that the search warrant was signed by the *second* judge to whom it was presented—after the *first* judge refused to sign the warrant on the ground that the affidavit was insufficient, but I would deny that motion if the evidence showed that the search warrant was not presented to the issuing judge until after it had been reviewed and approved by an Assistant State's Attorney.

For the reasons stated above, I would direct that the case at bar be remanded for further proceedings not inconsistent with this opinion.

---

but for the affiant's "reckless disregard for the truth," the suppression hearing court must "discount" the false information, "and then evaluate the affidavit without considering [the information proven to be false]." *Winters v. State,* 301 Md. 214, 226–27, 482 A.2d 886, 892 (1984).

**5.** To me, proof of "good faith" reliance requires more than proof that the officers *could* have relied in good faith upon the warrant.

Judge Adkins has authorized me to state that she joins in this opinion.

Dissenting Opinion by BARBERA, J., which ADKINS, J., joins.

Respectfully, I dissent. This case involves the applicability of the "good faith" exception to the Fourth Amendment exclusionary rule, which the Supreme Court first recognized in *United States v. Leon*, 468 U.S. 897, 900, 104 S.Ct. 3405, 3409, 82 L.Ed.2d 677, 684 (1984) and its companion case, *Massachusetts v. Sheppard*, 468 U.S. 981, 987–88, 104 S.Ct. 3424, 3427, 82 L.Ed.2d 737, 743 (1984). In the ensuing years, a number of states have rejected the good faith exception as incompatible with those states' constitutions. *See* 1 W. LaFave, Search and Seizure § 1.3(d) (4th ed. 2004) (collecting cases). Maryland, however, is among the states that have recognized and applied the good faith doctrine, as outlined in *Leon and Sheppard*. *See Patterson v. State*, 401 Md. 76, 105, 930 A.2d 348, 366 (2007); *McDonald v. State*, 347 Md. 452, 468–70, 701 A.2d 675, 683–84 (1997); *Connelly v. State*, 322 Md. 719, 729, 589 A.2d 958, 963 (1991).

To date, this Court has not recognized an exclusionary rule for evidence seized in violation of Article 26 of the Maryland Declaration of Rights.[1] *See Fitzgerald v. State*, 384 Md. 484, 508–09, 864 A.2d 1006, 1020–21 (2004) (recognizing the "current absence of an exclusionary rule under our state's constitution," and stating that "this is not the case to revisit whether

---

1. Article 26 provides:

   That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted.

   Although Article 26 does not expressly address warrantless searches and seizures, this Court has long interpreted it to prohibit unreasonable searches and seizures under the same circumstances as does the Fourth Amendment. *See, e.g., Givner v. State*, 210 Md. 484, 492–93, 124 A.2d 764, 768 (1956); *Miller v. State*, 174 Md. 362, 371, 198 A. 710, 716 (1938).

Article 26 contains an exclusionary rule"). *But see id.* at 520, 864 A.2d at 1026 (Greene, J., dissenting, joined by Bell, C.J.) (stating that the Court should take the opportunity presented in the case "to break with the tradition of reading Article 26 of the Maryland Declaration of Rights *in pari materia* with the Fourth Amendment" and "should interpret Article 26, in such a fashion, so as to afford [Maryland] citizens greater protections than those as interpreted under the Fourth Amendment").

Unless and until this Court recognizes an Article 26–based exclusionary rule and disclaims any exception for "good faith" violations of that state constitutional provision, I feel bound to follow the good faith doctrine as explicated and applied in *Leon, Sheppard,* and the cases that have applied that doctrine in Maryland.[2] Faithful application of those cases, in my view, compels the conclusion that the police acted in good faith when they searched Petitioner's home pursuant to the search warrant.[3]

In *Leon,* the Supreme Court declared: "[S]uppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in unusual cases in which exclusion will further the purposes of the exclusionary rule." 468 U.S. at 918–19, 104 S.Ct. at 3418, 82 L.Ed.2d at 695–96. Therefore, "the Fourth Amendment exclusionary rule should be modified so as not to bar the use in the prosecution's case in chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by proba-

---

**2.** This is not the case to consider breaking from current Maryland law on this subject because the issue was neither briefed nor argued. *See Garner v. Archers Glen Partners, Inc.,* 405 Md. 43, 46, 949 A.2d 639, 641 (2008) (stating that "appellate court[s] should use great caution in exercising [ ] discretion to comment gratuitously on issues beyond those necessary to be decided"); *accord People's Counsel for Balt. County v. Loyola College in Md.,* 406 Md. 54, 92 n. 29, 956 A.2d 166, 189 n. 29 (2008).

**3.** As does the majority, I include in my reference to Petitioner's "home" the vehicles that were also searched pursuant to the warrant.

ble cause." *Id.* at 900, 104 S.Ct. at 3409, 82 L.Ed.2d at 684. The *Leon* Court reasoned that, because the affidavit in support of the warrant at issue in that case set forth the results of an extensive police investigation, the warrant "provided evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause." *Id.* at 926, 104 S.Ct. at 3422, 82 L.Ed.2d at 701. Consequently, "the officers' reliance on the magistrate's determination of probable cause was objectively reasonable, and application of the extreme sanction of exclusion [was] inappropriate." *Id.*, 104 S.Ct. at 3422, 82 L.Ed.2d at 701.

In *Sheppard,* the Court stated the good faith exception this way: "[T]he exclusionary rule should not be applied when the officer conducting the search acted in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate that subsequently is determined to be invalid[.]" 468 U.S. at 987–88, 104 S.Ct. at 3427, 82 L.Ed.2d at 743. Applying the exception to the facts before it, the Court concluded that the warrant was facially defective in that it misstated the items that could be seized, yet the evidence the police obtained while executing the warrant was admissible because the affiant had properly set out the items to be seized and the police reasonably relied on the magistrate's representation that the warrant authorized them to conduct the requested search.

The Supreme Court emphasized in *Leon* that evidence seized pursuant to an invalid warrant will rarely be suppressed because "a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Id.* at 922, 104 S.Ct. at 3420, 82 L.Ed.2d at 698 (internal quotation marks and citations omitted). The Court identified four circumstances, however, in which "the officer will have no reasonable grounds for believing that the warrant was properly issued":

(1) In cases where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for [the officer's] reckless disregard for the truth,"

(citing *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978));

(2) "[I]n cases where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo–Ji Sales, Inc. v. New York,* 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979)," such that "no reasonably well trained officer" would rely on the warrant;

(3) In cases where the officer relies "on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,'" (quoting *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (Powell, J., concurring in part)); and

(4) In cases where the warrant is "so facially deficient—*i.e.,* in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume [the warrant] to be valid" (citing *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984)).

*Leon,* 468 U.S. at 922–23, 104 S.Ct. at 3420–21, 82 L.Ed.2d at 698–99. In any of those four circumstances, the good faith exception to the exclusionary rule does not apply, and suppression of the evidence is the remedy for the Fourth Amendment violation. *Id.* at 923, 104 S.Ct. at 3421, 82 L.Ed.2d at 699.

Petitioner asserts the applicability of the third circumstance outlined in *Leon,* which applies the exclusionary rule when "the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Petitioner contends, in particular, that the affidavit in support of the search warrant provides no indicia of probable cause that contraband would be found in his home. The majority agrees with Petitioner. I do not.

I begin with the proposition that the Supreme Court has not set a particularly high bar for demonstrating a probable cause belief that evidence of a crime might be found in a particular place. The Court has described "probable cause" as "a practical, nontechnical conception that deals with the factual and

practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Maryland v. Pringle*, 540 U.S. 366, 370, 124 S.Ct. 795, 799, 157 L.Ed.2d 769, 775 (2003) (internal quotation marks and citations omitted). The probable cause showing requires only a "fair probability" that the evidence sought is at the place designated to be searched. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548 (1983). Probable cause, moreover, "is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Pringle*, 540 U.S. at 370–71, 124 S.Ct. at 800, 157 L.Ed.2d at 775. Consequently, "the *quanta* ... of proof appropriate in ordinary judicial proceedings are inapplicable to the decision to issue a warrant. Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the [probable-cause] decision." *Id.* at 371, 124 S.Ct. at 800, 157 L.Ed.2d at 775 (internal quotation marks and citations omitted). Rather, " 'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.' " *Gates*, 462 U.S. at 235, 103 S.Ct. at 2330, 76 L.Ed.2d at 546 (quoting *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637, 645 (1969)).

Furthermore, any court that is called upon to review a warrant that is alleged to have lacked probable cause is required to give deference to the warrant-issuing judge's probable cause determination. There need be only a "substantial basis" for that determination, and, if that test is satisfied, then any reviewing court is bound to find the warrant in compliance with the dictates of the Fourth Amendment. *See Gates*, 462 U.S. at 238–39, 103 S.Ct. at 2332, 76 L.Ed.2d at 548.[4]

---

4. The Supreme Court's adoption of the "substantial basis" test reflects the Court's strong preference that police act with a warrant, rather than without one. As the Court stated long ago in *United States v. Ventresca*, 380 U.S. 102, 106, 85 S.Ct. 741, 744, 13 L.Ed.2d 684, 687 (1965), "a search under a warrant may be sustainable where without one it would

I accept for purposes of this opinion that there was not a substantial basis for the warrant-issuing judge's conclusion that the affidavit supplied probable cause to believe that Petitioner's house contained evidence of his suspected drug activity.[5]  The issue thus focuses solely on whether the good faith doctrine applies to foreclose application of the exclusionary rule.

To state the obvious, the *raison d'etre* of the good faith doctrine is to exempt from exclusion evidence seized pursuant to a warrant that falls short of satisfying the dictates of the Fourth Amendment, that is, a warrant that supplies fewer facts in support of probable cause than would be necessary to satisfy the "substantial basis" test.  This Court recognized as much, in *Patterson. See* 401 Md. at 105, 930 A.2d at 365 (stating that "application of the good faith exception does not hinge upon the affidavit providing a substantial basis for determining the existence of probable cause").  We explained in *Patterson* why this is so:

"If a lack of a substantial basis also prevented application of the *Leon* objective good faith exception, the exception would be devoid of substance.  In fact, *Leon* states that . . . a finding of objective good faith is [prevented] . . . when an officer's affidavit is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'  *Leon*, 468 U.S. at 923 [104 S.Ct. 3405].  This is a less demanding showing than the 'substantial basis' threshold

---

fail."  This deference to the decision of the magistrate to issue a warrant means that "a reviewing court is not to conduct a *de novo* probable cause determination," *Massachusetts v. Upton*, 466 U.S. 727, 728, 104 S.Ct. 2085, 2085, 80 L.Ed.2d 721, 724 (1984), but instead is to decide only "whether the evidence viewed as a whole provided a 'substantial basis' for the Magistrate's finding."  *Id.* at 732–33, 104 S.Ct. at 2088, 80 L.Ed.2d at 727.

**5.** I must assume the lack of a substantial basis for the magistrate's probable cause decision because this Court denied the State's conditional cross-petition raising that question.  We do not consider questions on which we declined to grant certiorari review.  *See e.g., Jackson v. State*, 364 Md. 192, 195 n. 2, 772 A.2d 273, 275 n. 2 (2001).

required to prove the existence of probable cause in the first place."

401 Md. at 105, 930 A.2d at 365–66 (quoting *United States v. Bynum*, 293 F.3d 192, 195 (4th Cir.2002) (citations omitted)); *accord United States v. Washington*, 380 F.3d 236, 241–42 (6th Cir.2004); *United States v. Danhauer*, 229 F.3d 1002, 1007 n. 1 (10th Cir.2000). We further explained in *Patterson* that the third *Leon* exception requires an objective inquiry that asks whether " 'officers, exercising professional judgment, could have reasonably believed that the averments of their affidavit related to a present and continuing violation of law, not remote from the date of their affidavit, and that the evidence sought would be likely found at [the place identified in the affidavit].' " 401 Md. at 107, 930 A.2d at 367 (quoting *Connelly*, 322 Md. at 735, 589 A.2d at 967). Only if the answer to that inquiry is that no "thoughtful and competent judge" could find that an officer could reasonably believe there was probable cause for the search does the third exception to the good faith doctrine apply. *See Leon*, 468 U.S. at 926, 104 S.Ct. at 3422, 82 L.Ed.2d at 701. In other words, "[t]he affidavit cannot be so 'bare bones' in nature as to suggest that the issuing judge acted as a 'rubber stamp' in approving the application for the warrant." *Patterson*, 401 Md. at 107, 930 A.2d at 367 (internal quotation marks and citations omitted).

The affidavit in support of the warrant in the present case is not a "bare bones" affidavit. The warrant contains sufficient facts demonstrating, either directly or by reasonable inference, that Petitioner was an upper level distributor of crack cocaine in two Baltimore City neighborhoods and was engaged in that enterprise with his cousin Andrew Tillman; that Petitioner then lived at 3 Six Point Ct., Windsor Mill, Maryland, 21244 (a Baltimore City address); and that he kept at that address expensive assets belonging to him yet not corresponding to his reported income as an employee of Baltimore City.[6]

---

6. Unlike the majority, I am satisfied that the affidavit contains sufficient evidence of Petitioner's connection to a drug trafficking enterprise.

Further, the two affiants, both of whom had significant experience and expertise in drug investigations, asserted that drug traffickers, as Petitioner was suspected of being, are likely to keep evidence of their drug distribution enterprise in their homes. Reviewing courts, like warrant-issuing magistrates in the first instance, are entitled to give credence to the expertise and experience of police officers in developing knowledge about the practices and proclivities of drug dealers. *See United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 750–51, 151 L.Ed.2d 740, 749–50 (2002) (stating that such a totality of the circumstances approach "allows officers to draw on their own experience and specialized training to make

The Affiants reported that, during their three-week investigation of drug trafficking in Edmondson Village and Cherry Hill, "multiple confidential informants" advised the police that "Gary Samuel Agurs [Petitioner] and associates were upper level distributors supplying crack cocaine in and around these locations." Both of the two informants specifically identified in the affidavit had proven themselves reliable in connection with prior drug arrests.

One of the informants identified Petitioner as a Baltimore City employee and described him "as an upper level supplier of the suspected narcotics to the street dealers in the area." The police confirmed that Petitioner is employed at the Baltimore City Department of Public Works. And, during surveillance of Petitioner, the police witnessed an incident between him and another man that suggested a possible transfer of drugs. The same confidential informant disclosed that Petitioner was assisted by his cousin, "Dru," whom police later identified as Andrew Tillman. The police conducted surveillance of Tillman, setup two controlled purchases from him of crack cocaine in Cherry Hill, and observed Tillman engage in other suspected drug transactions.

Finally, the police observed Petitioner and Tillman meet outside an "auto detail shop," where the police watched Petitioner "entering the passenger side of [Tillman's] car. After approximately two minutes, [Petitioner] exited the vehicle and Andrew Tillman quickly left the area."

The observations of the police, considered in their totality "and giving appropriate deference to what the officers reasonably could infer from those observations," provide some corroboration of the reliable informant's report that Petitioner is a high level drug distributor. Given that not every detail of even a mere "tipster's" reports need be corroborated for it to be accorded some reliability, *see generally Gates,* 462 U.S. at 245–46, 103 S.Ct. at 2336, 76 L.Ed.2d at 553, I am persuaded that the police could have reasonably believed, based on information in the affidavit, that there was a fair probability that Petitioner was trafficking in illegal drugs.

inferences from and deductions about the cumulative information available to them that might well elude an untrained person").

To be sure, the affidavit in the present case does not provide a *direct* nexus between Petitioner's suspected high-level drug distribution and his home as a repository of evidence of his drug activity. But no such direct nexus need be established in this case in order to conclude that the police acted in good faith in relying on the warrant. Several decisions of this Court explain why.

One such case is *State v. Ward,* 350 Md. 372, 712 A.2d 534 (1998). In that case, we considered "whether there was probable cause [contained in a search warrant] to believe that instrumentalities and evidence of a street murder could be found in the residence and/or motor vehicle of the person identified as the murderer." *Id.* at 374, 712 A.2d at 534. We held that there was probable cause for such belief and, in so holding, we rejected the respondent's contention that there was an insufficient nexus between the item sought (the murder weapon or, at least, evidence that the respondent owned or possessed a firearm) and the places to be searched (the respondent's home and car). *Id.* at 377–78, 712 A.2d at 536.

In reaching that conclusion, we relied on an earlier decision, *Mills v. State,* 278 Md. 262, 363 A.2d 491 (1976), as well as decisions from our sister jurisdictions that "sustained warrants, without any express evidence of nexus," when the affidavits "contained probable cause to believe that a crime of violence, involving the use of a weapon, had been committed, that the defendant was the criminal agent, and that the defendant resided at the place to be searched." *See Ward,* 350 Md. at 378–386, 712 A.2d at 536–40. We also relied in *Ward* on a passage from *United States v. Lucarz,* 430 F.2d 1051, 1055 (9th Cir.1970), a case involving prosecution for theft from the mails:

> [T]his court and others, albeit usually without discussion, have upheld searches although the nexus between the items to be seized and the place to be searched rested not on

direct observation, as in the normal search-and-seizure case, but on the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide stolen property.

*Ward,* 350 Md. at 379, 712 A.2d at 537 (noting our favorable treatment of *Lucarz* in *Mills* ) (internal quotation marks and citations omitted). We added:

Concrete firsthand evidence that the items sought are in the place to be searched is not always required in a search warrant [.] The question is whether one would normally expect to find those items at that place[.] We think it clear that [the defendant's] residence would be a logical place to search for the weapon and clothing used in the crime.

*Ward,* 350 Md. at 383, 712 A.2d at 539 (quoting *Blount v. State,* 511 A.2d 1030, 1033 (Del.1986)). We recognized in *Ward* that, even though the affidavit contained no facts indicating that the murder weapon and related evidence would be found in the respondent's home, there was sufficient evidence to infer a nexus between the two, or at the least, to defer to the magistrate's drawing such an inference. *See* 350 Md. at 386, 389, 712 A.2d at 540, 542.

*Holmes v. State,* 368 Md. 506, 796 A.2d 90 (2002), a case factually closer to the present case, is to like effect. That case involved a challenge to the issuance of a warrant to search the home of a suspected drug dealer. Holmes argued that the warrant affidavit did not establish a nexus between a single instance of his suspected involvement in drug dealing and his home as the repository of evidence of that activity. We disagreed, relying in large part upon the reasoning of *Ward, Mills,* and a number of federal cases that "approach[ ] the nexus issue in terms of pure deductive reasoning." *Id.* at 522, 796 A.2d at 99 (citing *United States v. Feliz,* 182 F.3d 82 (1st Cir.1999); *United States v. Cruz,* 785 F.2d 399 (2d Cir.1986); *United States v. Hodge,* 246 F.3d 301 (3d Cir.2001); *United States v. Williams,* 974 F.2d 480 (4th Cir.1992); *United States v. McClellan,* 165 F.3d 535 (7th Cir.1999); *United States v.*

*Riedesel,* 987 F.2d 1383 (8th Cir.1993); *United States v. Terry,* 911 F.2d 272 (9th Cir.1990); *United States v. Reyes,* 798 F.2d 380 (10th Cir.1986)).

We recognized that "the mere observation, documentation or suspicion of a defendant's participation in criminal activity will not necessarily suffice, by itself, to establish probable cause that inculpatory evidence will be found in the home." *Id.* at 523, 796 A.2d at 101 (internal citations omitted). We added that "[t]here must be something more that, directly or by reasonable inference, will allow a neutral magistrate to determine that the contraband may be found in the home." *Id.* at 523, 796 A.2d at 101 (internal citations omitted). We observed, however, that

> [t]he reasoning, supported by both experience and logic, is that, if a person is dealing in drugs, he or she is likely to have a stash of the product, along with records and other evidence incidental to the business, that those items have to be kept somewhere, that if not found on the person of the Defendant, they are likely to be found in a place that is readily accessible to the Defendant but not accessible to others, and that the Defendant's home is such a place.

*Id.* at 521–22, 796 A.2d at 100. We held that the facts set forth in the warrant rendered Holmes's case one that "[a]t the very least [ ] would fall within the realm of a marginal case in which ... deference must be given to the warrant." *Id.,* 368 Md. at 523, 796 A.2d at 101.

*Holmes, Ward* and *Mills* all involved warrants that were deemed to have *satisfied* the Fourth Amendment because, in each, there were sufficient facts alleged to permit at least a substantial basis for a reasonable inference of a nexus between the suspected criminal activity and the suspect's home. Here, of course, we are beyond determining whether the warrant satisfies the Fourth Amendment, because we have accepted that it does not. Therefore, we need only decide whether the warrant affidavit was so lacking in indicia of probable cause of a nexus between Petitioner's drug activity and his home as a repository of evidence of that activity as to render official

belief in its existence entirely unreasonable. If thoughtful and competent judges could disagree on this point, then it follows that the police relied in good faith upon the warrant.

In my view, the facts alleged in the warrant affidavit are sufficient to allow reasonable officers, exercising their professional judgment, to believe that there was a fair probability that Petitioner's house contained evidence of his suspected drug activity. Therefore, the police could rely in good faith upon the warrant directing them to search Petitioner's home for such evidence. I therefore would affirm the judgment of the Court of Special Appeals, which comes to the same conclusion.

Judge ADKINS has authorized me to state that she joins in the opinion.

Dissenting Opinion by ADKINS, J.

I agree with Judge Barbera's dissent to the extent that she opines than the police *could* have acted in good faith, but agree with Judge Murphy's dissent, in his view that proof of "good faith" reliance requires more than proof that the officers could have relied in good faith upon the warrant. Therefore, like Judge Murphy, I would direct that this case be remanded for further proceedings not inconsistent with his opinion.